## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

| | |
|---|---|
| NICKIE SPILLERS,<br><br>*Plaintiff*<br><br>v.<br><br>LOUISIANA PHS, LLC, and PROVIDER HEALTH SERVICES, LLC,<br><br>*Defendants* | CIVIL ACTION NO. _____<br><br><br>**COLLECTIVE ACTION PURSUANT TO 29 U.S.C. § 216(b)**<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

    **NOW INTO COURT,** through undersigned counsel, comes Plaintiff, Nickie Spillers ("Plaintiff" or "Ms. Spillers"), on her own behalf and on behalf of those similarly situated (at times hereinafter referred to collectively as "Plaintiffs"), allege as follows:

### I.      PRELIMINARY STATEMENT

    1.    Ms. Spillers, a Nurse Practitioner, is a front-line worker and was treating elderly patients in long-term care facilities during the COVID-19 pandemic, despite the risk to her own health she faced while caring for this vulnerable population. She now brings this action because Defendants Louisiana PHS, LLC, and Provider Health Services, LLC (collectively "Defendants") failed to pay her any wages for her last six weeks of work and used unlawful fines and penalties to deny her these wages.

    2.    This case also arises from the longstanding policies and practices in place at the long-term care facilities owned, operated, and managed by Defendants in the Western District of

Louisiana and throughout the State of Louisiana, which result in non-exempt workers like Ms. Spillers working far in excess of 40 hours per work week, and then being denied wages and overtime compensation owed to them under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq*. (hereinafter "FLSA") and the Louisiana Wage Payment Act, La. R.S. 23:621, *et seq*. (hereinafter "LWPA").

3.      Ms. Spillers brings this action on behalf of herself and other similarly situated current and former Nurse Practitioners who have worked at the long-term care facilities as employees of Defendants and who elect to opt-in to this action pursuant to the FLSA's collective action provision, 29 U.S.C. § 216(b).

4.      Ms. Spillers also brings this action on behalf of herself and all similarly situated current and former Nurse Practitioners who worked at the long-term care facilities operated by Defendants in the State of Louisiana to remedy Defendants' violations of Louisiana state law, including, but not limited to, the LWPA and the Louisiana Unfair Trade Practices Act, La. R.S. 51:1401, *et seq*. (hereinafter "LUPTA").

## II.      JURISDICTION AND VENUE

5.      This action alleges the violation of rights under the FLSA. Thus, the predominant action herein gives rise to the jurisdiction in this Court pursuant to 28 U.S.C. §1331. Furthermore, there exist additional state causes of action, including class claims under Rule 23 of the Federal Rules of Civil Procedure, that arise out of the same transaction or occurrence as the underlying federal cause of action, and this Court has ancillary jurisdiction over these counts pursuant to 28 U.S.C. §1367.

6.      The Court has personal jurisdiction over Defendants since they regularly conduct business in the State of Louisiana, and therefore have minimum contacts with the State of Louisiana. Venue lies in this Court over these claims pursuant to 28 U.S.C. § 1391(b) and (c) as a

substantial part of the events or omissions giving rise to the claim occurred in the Western District of Louisiana.

### III.    PARTIES

#### A.    Plaintiffs

7.    Named Plaintiff, Ms. Spillers, is a citizen of the United States of America who resides in the Western District of Louisiana. From May 25, 2020, until December 1, 2020, Defendants Louisiana PHS, LLC, and Provider Health Services, LLC employed Ms. Spillers as a Nurse Practitioner ("NP"). Ms. Spillers performed her job duties for Defendants entirely in the Western District Louisiana, and was based out of her home office in West Monroe, Louisiana. She then traveled to long-term care facilities to provide medical services at the long-term care facilities that Defendants contracted with in order to provide nurse practitioner services.

8.    Named Plaintiff Ms. Spillers was one of  more than 50 NPs employed by Defendants in the Western District of Louisiana and in at least eleven (11) other states across the southern United States. Like Ms. Spillers, these Nurse Practitioners worked out of their home offices, and then traveled to long-term care facilities assigned by Defendants to provide medical services in accordance with the contracts Defendants entered into with those facilities to provide Nurse Practitioner services.

9.    Ms. Spillers seeks to assert her claims individually, and on behalf of all of those similarly situated, who are currently employed by Defendants and/or who have been employed by Defendants any time in the last three years to the present, pursuant to 29 U.S.C. § 216, as set forth in detail below.

10.    The FLSA and Rule 23 classes of similarly situated employees (hereinafter "Putative Class Members") include, but are not limited to, non-exempt NPs.

11.     Ms. Spillers' written consent to join this FLSA collective action is attached as Exhibit A to this Complaint.

**B.     Defendants**

12.     Defendant Louisiana PHS, LLC (hereinafter sometimes referred to as "Louisiana PHS") is a Louisiana Limited Liability Company domiciled in Baton Rouge, Louisiana, and headquartered at 1509 Dulles Drive, Lafayette, LA 70506, in the Western District of Louisiana. It has contracts with facilities to provide its employees, including Nurse Practitioners, to provide services to long-term care facilities located in 10 southern states as well as Louisiana and the following parishes located in the Western District of Louisiana: Bossier, Webster, Claiborne, Jackson, Ouachita, Bienville, and Caddo. Louisiana PHS has two members: Provider Health Services, LLC, and Nicole Howard, Manager. Upon information and belief, Defendant Louisiana PHS is a wholly-owned subsidiary of Defendant Provider Health Services, LLC.

13.     Defendant Provider Health Services, LLC is a Delaware Limited Liability Company authorized to do business in Louisiana. It identifies its principal business office as 1509 Dulles Drive, Lafayette LA 70506. Provider Health Services, LLC has five members: Nicole Howard, Registered Agent and Manager; TTS Holdings, LLC, Member; Mark Smith, Member; and James Clinton, Member. Upon information and belief, Defendant Provider Health Services, LLC wholly owns Defendant Louisiana PHS, LLC.

14.     Ms. Spillers' employment contract with Defendants required that all written notices be sent to Provider Health Services, LLC at its principal business office in Lafayette, Louisiana. Ms. Spillers was directed to identify herself as a Provider Health Services employee. All staff Ms. Spillers interacted with identified themselves as Provider Health Services employees.

### IV.    FACTUAL BACKGROUND

**A.    Defendants Hired Ms. Spillers and Provided Limited Training and Onboarding.**

15.    Ms. Spillers is a Nurse Practitioner and front-line worker who provides essential services to elderly patients in long-term care facilities. This work is high risk and in demand due to the ongoing COVID-19 pandemic. Out of her concern for patient care and commitment to ensuring society's most vulnerable citizens continued to receive high-level care, Ms. Spillers sought out a new position as a Nurse Practitioner in the Spring of 2020.

16.    Ms. Spillers was hired by Defendants on May 25, 2020. She was hired, and at all times employed by Defendants, as a Nurse Practitioner.

17.    For her first two days of work, on May 26 and May 27, 2020, Ms. Spillers attended two days of virtual training, followed by one half-day of virtual training on May 28, 2020. The two-and-a-half day training focused on basic standard of care issues well-known by Nurse Practitioners, including topics such as wound care, geriatrics, aging, HIPAA compliance, and malpractice. The only other information provided was what was needed in order to utilize their Electronic Medical Record and the typical Human Resources information provided to employees upon hire. There was no proprietary value to any of this training or information.

18.    Although Defendants stated a third day of training would occur, it was cancelled. Defendants also stated Ms. Spillers would "shadow" other providers thereafter for an additional five days as part of her training, but she was only given the opportunity to shadow for just two half-days in June 2020.

**B.    Defendants Required Ms. Spillers to Sign an Employment Agreement.**

19.    On May 29, 2020, after her orientation, Defendants asked Ms. Spillers to sign a Practitioner Employment Agreement (hereinafter "Employment Agreement"). In the Employment

Agreement, Defendants stated that Ms. Spillers "shall receive a guaranteed salary" of $7,500 a month during an "Evaluation Period." In addition, the Employment Agreement provided that Ms. Spillers "may receive a Personal Productivity Bonus" during the evaluation period if she submitted a minimum number of patient encounters for billing each month. Each month, this threshold number increased exponentially. In order to receive the productivity bonus at the end of Month One, employees were required to submit at least 125 patient encounters for billing. By Month Three, however, Ms. Spillers would not be eligible for this bonus unless she billed a minimum of 225 encounters – nearly double what was expected of her during Month One.

20.     The Employment Agreement stated that after the three-month evaluation period, Ms. Spillers would no longer receive a salary. Instead, each month, Defendants would pay her according to a "Productivity-based Fee Schedule," which calculated Ms. Spillers' "Base Rate" based on the "overall state reimbursement rate per CPT code for billed visits and procedures." Defendants would then pay Ms. Spillers a "Monthly Rate" equal to "approximately 90% of the Practitioner's total anticipated calendar month Base Rate income." Then, the following month, Defendants would subtract this Monthly Rate from the "total productivity-based earnings processed for the same month." If the Monthly Rate was lower than the productivity-based earnings, Defendants paid the excess amount to Ms. Spillers. However, if the Monthly Rate was higher than the productivity-based earnings, then Defendants could choose one of three actions to take: (1) "[c]arrying the shortfall over to the reconciliation process for one or more subsequent months;" (2) "[a]djusting Practitioner's Monthly Base Rate Payment in the current or subsequent months;" or (3) "[r]equiring Petitioner to pay Group the amount of the shortfall[.]" Defendants referred to this as the "True Up Process."

21.    The Employment Agreement also claimed that the "orienting, training, credentialing, licensing, insuring, and onboarding of new Practitioners" had "costs . . . in excess of Ten Thousand Dollars ($10,000)" and that the initial orientation and onboarding expenses were a "significant proprietary value." It further stated that if an employee departed within 18 months, Defendants would "equally amortizes[] the $10,000 value of the orientation over the first full (18) months of employment, and will withhold or invoice Practitioner for the balance . . . ." The Employment Agreement does not explain what proprietary information was used as part of this process.

22.    Despite claiming Ms. Spillers would owe $10,000 for "orienting, training, credentialing, licensing, insuring, and onboarding," the Employment Agreement also required that she purchase her own malpractice insurance. Further, Defendants only agreed to reimburse Ms. Spillers for 50% of her malpractice coverage, except in certain limited situations, and required that she be covered at higher limit amounts (One Million Dollars ($1,000,000) per individual claimant and Three Million Dollars ($3,000,000) per claimed event) making her coverage more expensive. Defendants also required Ms. Spillers to repay them for a portion of the malpractice insurance if she left her position within 12 months.

23.    In addition to claiming Ms. Spillers would owe the $10,000 for "orienting, training, credentialing, licensing, insuring and onboarding," the Employment Agreement also established cash penalties that would be imposed upon Ms. Spillers for "resign[ing] and/or depart[ing]" from her position without giving Defendants at least 60 days' advance notice. She had to provide 60 days' notice or "One Hundred Fifty Dollars ($150) shall be owed (withheld from final payments, or if insufficient earnings, invoiced) for each day provided to the Group less than a full sixty (60) day notice."

24.    After signing, on June 12, 2020, Defendants reimbursed her for just $393 for malpractice coverage. Earlier in the year, Ms. Spillers paid $768 for that coverage.

**C.    Ms. Spillers Worked More Than 40 Hours Per Week and Was Not Paid Overtime.**

25.    While employed by Defendants, Ms. Spillers' job duties always demanded she work more than 40 hours a week.

26.    Ms. Spillers spent more than 40 hours a week providing patient care either onsite or via telehealth at the long-term care facilities where she was assigned. Further, her contract with Defendants required her to be physically present or available to perform duties for and/or at each individual facility Monday to Friday from 8:00am to 5:00 pm, 45 hours a week. Ms. Spillers always met that requirement.

27.    In addition, Ms. Spillers was expected to remain on call 24 hours per day, seven days a week with no additional reimbursement. While on call, she typically spent several additional hours per day communicating with staff at the long-term care facilities about treatment for patients.

28.    Further, at long-term care facilities, and while working from home, Ms. Spillers also had to complete charts for her patients which took several additional hours a week.

29.    In addition to her other job duties, Defendants also required Ms. Spillers and other NPs to attend a weekly Thursday meeting. She was also required to participate in and complete a "Mandatory New Hire NP Mentorship Program" each week, which consisted of a PowerPoint presentation and quiz that required completion by Sunday evening, or risk being placed on a "Corrective Action Plan."

30.    Further, each week, Ms. Spillers had to complete additional continuing education materials and take a mandatory test. This took approximately an hour and a half each work week.

31.     In mid-July 2020, she also had to begin taking a new weekly independent education mentorship class for six weeks, which required about an hour of work each weekend.

32.     In total, Ms. Spillers worked an average of 60 hours per week actively working, and was on call 24 hours a day, seven days a week.

33.     Ms. Spillers was a full time, non-exempt employee of Defendants. As a non-exempt employee, Ms. Spillers was entitled to overtime pay.

34.     Defendants did not pay Ms. Spillers a set salary. Instead, each pay period, she received a fluctuating amount which varied depending on the number of reductions, or increases, Defendants made from her "Monthly Rate." These increases, and decreases, were based on the quality and quantity of the work she performed. As a result, Ms. Spillers was not correctly compensated for hours she routinely worked in excess of forty (40) hours per week.

**D.     Defendants Failed to Properly Calculate Ms. Spillers' Wages and Withheld Earned Wages.**

35.     Exhausted from working non-stop treating elderly patients during the pandemic, Ms. Spillers took two days of paid leave on Thursday, October 8 and Friday, October 9, 2020 to emotionally recover and prepare for Hurricane Delta's imminent landfall. Though she was on paid leave, Ms. Spillers remained on call and was required to address any needs that arose with patients in the long-term care facilities she served.

36.     Despite knowing Ms. Spillers was on paid leave, Defendants expected her to work anyway. On October 9, 2020, Ms. Spillers' supervisor, Stacy Durr, informed her that she had monitored her chart input for the previous day and stated "to say I am disappointed is an understatement." Ms. Durr ordered Ms. Spillers to input her notes and get them up to date by Monday, October 12, 2020, or else she would be placed on a corrective action plan requiring "very close follow up" and making her ineligible for a quarterly bonus. Ms. Spillers asked how to

"handle" the time she spent inputting notes on Friday, Saturday, and Sunday, as she was on approved paid time off. Ms. Durr did not respond, and instead, noted on Ms. Spillers' paystubs that she took two (2) full vacation days on October 8 and October 9, 2020.

37.     On October 12, 2020, Ms. Spillers told Ms. Durr she was overwhelmed and tired from staying up until after 4 am the prior night entering visits into the electronic medical record, and Ms. Durr told her she would have to "figure it out" or stay up at night until she finished entering all of her charts.

38.     On October 16, 2020, Ms. Spillers notified Defendants in writing that she was resigning effective December 11, 2020.

39.     After that notice, Defendants decided to never pay Ms. Spillers again, even though they demanded that she continue to work full time for the next six weeks.

40.     For the October 16 to October 31, 2020 pay period, Ms. Spillers worked approximately 120 hours. Further, during the "True Up" process, based on the number of patients she treated, Defendants determined that Ms. Spillers did have a "Positive True Up" amount owed to her in the amount of $1,991.18 in addition to her "Monthly Rate." She never received any bonus pay or other wages whatsoever for that pay period.

41.     The last payment Ms. Spillers ever received from Defendants was on October 30, 2020 for work performed from October 1, to October 15, 2020. After that, Defendants did not even notify Ms. Spillers that they would no longer pay her earned wages.

42.      Ms. Spillers worked approximately 120 hours during November 1 to November 15, 2020 pay period.

43.     On her next payday, November 13, 2020, Ms. Spillers was left to wonder why she did not receive a paycheck for October 16, 2020 to October 31, 2020. Ms. Spillers then checked

the Defendants "True Up" data system that tracked her earnings and discovered that all her data regarding patients treated in November 2020 was missing.

44.    Later on November 13, 2020, Ms. Spillers then asked Paula Broussard, Administrative Assistant, why she had not been paid her wages, and she agreed to pass on Ms. Spillers complaint to Dana Johnson, from payroll. Ms. Durr, her supervisor, responded only that she did not know.

45.    On November 16, 2020, just three days after Ms. Spillers lodged complaints as to Defendants' refusal to pay any earned wages, Ms. Durr informed Ms. Spillers that her employment was terminated. However, Ms. Durr and Debbie Genereaux, Director of Human Resources, told Ms. Spillers that even though her last day of formal employment with Defendants was November 16, 2020, she had to continue working to finish documenting all patient charts before November 25, 2020. Further, Ms. Genereaux claimed that if Ms. Spillers did not finish her charts by then she would be fined an additional $750 by Defendants.

46.    Also on November 16, 2020, in a letter, Ms. Genereaux admitted that Defendants planned to continue to withhold her wages earned from October 16, 2020 to December 11, 2020. Ms. Genereaux explained that Defendants intended to recoup "fees" that would be withheld from any wages owed to Ms. Spillers and prior to paying any further wages owed to her based on a resignation date of December 11, 2020, in the following amounts: $450 for providing "only" 57 days' notice of intent to resign, instead of 60 days' notice; $6,388.89 for "orientation expenses"; and $163.73 for malpractice insurance, for a total amount of $7,002.64. Furthermore, Ms. Genereaux informed Ms. Spillers that, should Ms. Spillers not return "equipment" within five business days, it would be "inferred" that her intention was to keep the equipment, and the "Fair Market Value" of any unreturned equipment would be deducted from her final pay as well.

11

47.    Defendants' conduct placed Ms. Spillers in a catch-22: she was working for no pay at all, putting at risk her family's ability to pay basic household expenses and care for their children, and if she tried to leave the position more quickly to get a new position in which she would receive pay for her work, Defendants were threatening to charge her $150 per day for providing less notice of intent to resign. Fearful of incurring any additional penalties, Ms. Spillers continued working.

48.    On November 19, 2020, Ms. Genereaux asked Ms. Spillers to continue working on her charts and threatened her, noting that if she did not perform this uncompensated work, she would be in violation of Louisiana Board of Nursing's tenets of responsible nursing care and liable if any malpractice suit was filed.

49.    Based on Ms. Durr's threats, Ms. Spillers continued to work, completing charts, from November 16 to November 30, 2020. Ms. Spillers worked approximately eight hours a day during that time. Again, Defendants withheld all of Ms. Spillers' wages and did not pay her any of her earned wages for these hours either.

50.    On December 1, 2020, Defendants asked Ms. Spillers to complete additional work, asking her to provide clarification and update charts on several additional patients. Ms. Spillers spent approximately an hour completing that work. Again, she was not paid for this work.

51.    On December 7, 2020, Defendants again refused to pay Ms. Spillers her wages and applied the wage fines and deductions listed in the November 16, 2020 letter. Ms. Genereaux notified Ms. Spillers that Defendants were withholding $4,365.78, which was all of her November 2020 wages, as well as 30.94 hours that Ms. Spillers was owed as unused accrued Paid Time Off in the amount of $1,330.42. Ms. Genereaux then claimed that Ms. Spillers owed Defendants an

additional $1,598.08 to cover the rest of the fines, but then claimed the company would "waive the final negative balance."

52.    After receiving that email, on December 13, 2020, Ms. Spillers emailed Ms. Genereaux and requested an itemized list explaining the money withheld by Defendants, and noting that as "you are aware, I have had no pay since 10/15/2020." Further, she explained that "Louisiana law specifically prohibits employers from including terms in their employment contracts that require employees to forfeit their wages, in the event of their resignation." Ms. Spillers also wrote that Ms. Genereaux was aware that she was violating the LWPA and the FLSA by withholding Ms. Spillers pay for two months. She requested payment of all, or at least, the undisputed amount she was owed.

53.    Ms. Spillers further noted that Defendants had failed to pay her the "True Up" owed for October 2020. Ms. Spillers further explained that she was also owed a $100 reimbursement for her phone and PTO for a total of $1,330.42.

54.    Upon information and belief, Defendants required all Nurse Practitioners to sign the same form Employment Agreement as Ms. Spillers, containing the same compensation structure and penalties outlined in more detail above.

**E.    Coverage Under the FLSA**

55.    At all times relevant to this Complaint, Defendants have been an employer within the meaning of the Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

56.    At all times relevant to this Complaint, Defendants have been an enterprise within the meaning of Section 3(r) of the FLSA, 29 U.S.C. § 203(r), because Defendants Louisiana PHS, LLC, and Provider Health Services, LLC, performed "related activities . . . (either through unified operation or common control) . . . for a common business purpose," 29 U.S.C. § 203(r)(1), in that said activities were performed "in connection with the operation of . . . an institution primarily

engaged in the care of the sick, the aged, the mentally ill or defective who reside on the premises of such institution." 29 U.S.C. § 203(r)(2)(a).

57.    At all times relevant to this Complaint, Defendants have been an enterprise engaged in commerce or in the production of goods for commerce within the meaning of Section 3(s) of the FLSA, 29 U.S.C. § 203, in that Defendants operate an enterprise that has employees engaged in commerce and has annual gross revenues that exceed $500,000.00. 29 U.S.C. § 203(s)(1)(A).

58.    At all times relevant to this Complaint, Defendants have been an enterprise engaged in commerce or in the production of goods for commerce under the FLSA because they operated an enterprise which "engaged in the operation of . . . an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution." 29 U.S.C. § 203(s)(1)(B).

59.    At all times relevant, Plaintiff and the Putative Class Members were individual employees engaged in performing activities within the meaning of 29 U.S.C. § 203(r) as required by 29 U.S.C. §§ 206, 207.

60.    Plaintiff brings this action on behalf of the following class of similarly situated individuals: All current and former Nurse Practitioners, or those who performed non-exempt duties similar to Ms. Spillers' job duties, whether currently employed by Defendants or employed by Defendants within the last three years, who elect to opt-in to this collective action pursuant to the FLSA, 29 U.S.C. § 216(b).

61.    The members of the class are so numerous that joinder of all other members of the class is impracticable. While the exact number of the other members of the class is unknown to Plaintiff at this time and can only be ascertained through applicable discovery, Plaintiff believes there are at least 40 individuals in the class.

62.     The claims of Plaintiff are typical of the claims of the class. Plaintiff and the other members of the class work or have worked for Defendants and were subject to the same operational, compensation, classification and timekeeping plans, policies, and practices, including the failure to pay Plaintiff and other misclassified employees overtime compensation under the FLSA for all hours worked in excess of forty (40) hours per week during the relevant statutory limitations' period.

63.     Collective action mechanism is superior to the other available methods for a fair and efficient adjudication of the FLSA claims. The expenses, costs, and burden of litigation suffered by individual other members of the class in a collective action are relatively small in comparison to the expenses, costs, and burden of litigation of individual actions, making it virtually impossible for other members of the class to individually seek redress for the wrongs done to them.

64.     Plaintiffs and other members of the class have suffered and will continue to suffer irreparable damage from the unlawful policies, practices, and procedures implemented and administered by Defendants.

## V.      CAUSES OF ACTION

### COUNT 1
### VIOLATIONS OF THE FLSA

65.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above as though fully set forth herein.

66.     The FLSA requires employers to compensate employees "at a rate not less than one and one-half times the regular rate at which he is employed" for any hours worked in excess of 40 hours per workweek. 29 U.S.C. § 207(a)(1).

67.     Plaintiff and the putative class do not fall within any exemption from the FLSA and was required to be paid according to the dictates of that section.

68.    At all relevant times, Defendants and their representatives directed the means and manner by which Plaintiff and the putative class were compensated.

69.    During the relevant time period, Defendants violated the FLSA's overtime pay requirements by employing Plaintiff and the putative class to engage in commerce within the meaning of the FLSA for workweeks longer than 40 hours without compensating her for overtime at a rate no less than one and one-half times her regular rate in violation of 29 U.S.C. §§ 206 and 207(a)(1) and 29 C.F.R. § 778.315.

70.    Defendants knew Plaintiff and the putative class performed work that required that they be paid minimum wage and overtime compensation under the FLSA. Nonetheless, Defendants operated under the aforementioned centralized and uniform plans, policies, and practices with the intent to deprive Plaintiff and other Nurse Practitioners they employed of such overtime compensation in violation of the FLSA

71.    No exemption excused Defendants from paying Plaintiff and the putative class overtime for the overtime hours she worked.

72.    Defendants' practice of failing to correctly pay Plaintiffs for overtime hours is a violation of the FLSA.

73.    The illegal pattern or practice on the part of Defendants with respect to Plaintiffs' overtime compensation was known by Defendants to be in violation of the FLSA.

74.    Defendants knew of its requirements to abide by the FLSA and did not make a good faith effort to comply with the FLSA.

75.    Defendants' refusal and/or failure to properly pay for overtime was done so knowingly, willfully, or in reckless disregard in carrying out its illegal pattern or practice.

76.     The decision by Defendants not to properly calculate and compensate Plaintiffs' wages was neither reasonable, nor in good faith.

77.     Further, Section 211 of the FLSA further requires employers to keep accurate records of data related to their employees' "wages, hours, and other conditions and practice of employment." 29 U.S.C. § 211(a), (c).

78.     Defendants failed and/or refused to document the hours Plaintiffs worked each workweek, Plaintiffs' total overtime earnings for the work week, and all additions to or deductions from Plaintiffs' wages.

79.     Defendants violated the FLSA by failing to keep records regarding Plaintiffs' employment and compensation in accordance with the requirements of 29 U.S.C. §211.

## COUNT 2
### RETALIATION IN VIOLATION OF THE FLSA
### 29 U.S.C. § 215(A)(3)

80.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above as though fully set forth herein.

81.     The FLSA prohibits any employer from "discharg[ing] or in any other manner discriminat[ing] against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act." 29 U.S.C. § 215(a)(3).

82.     Defendants retaliated against Plaintiff for complaining that Defendants were violating her rights under the FLSA by threatening to interfere with her nursing license and assessing additional illegal fines to her earned wages.

83.     Upon information and belief, these same retaliatory practices were perpetrated upon the Putative Class Members.

84.     Accordingly, Plaintiff and Putative Class Members are entitled to lost wages, plus liquidated damages, attorney's fees, and costs.

## COUNT 3
### VIOLATIONS OF THE LWPA – UNPAID WAGES
### LA. R.S. 23:631 ET. SEQ.

85.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above as though fully set forth herein.

86.    The LWPA requires employers to inform employees at the time of hire "what wages they will be paid, the method in which they will be paid and the frequency of payment along with any subsequent changes thereto." La. R.S. 23:633(A).

87.    Through the various schemes outlined herein, Defendants employed policies, plans, and/or practices resulting in Defendants failing and/or refusing to tender owed wages to Plaintiff and those similarly situated at the rate and frequency agreed upon as required by law and public policy.

88.    Defendants violated the LWPA by failing and/or refusing to pay earned wages to Plaintiff, and those similarly situated, at the frequency and rates agreed upon in its employment contract.

89.    Further, under the LWPA, Defendants were required to remit all of the overdue/final wages owed Plaintiff, and those similarly situated, within fifteen (15) days of termination of their employment. La. R.S. 23:631.

90.    Plaintiff submitted numerous amicable demands for Defendants to remit all earned overdue wages including owed bonuses and other compensation, under La. R.S. 23:632.

91.    Defendants' refusal to tender all earned wages to Plaintiff, and those similarly situated to her, after the termination of their employment is contrary to law and public policy.

92.    Defendants' actions, contractually or otherwise, to impute fines, penalties, reductions, arbitrary "training" expenses, or any other scheme to convert Plaintiff' earned wages,

and those similarly situated to her, is an inexcusable attempt to justify wage theft and is contrary to law and public policy.

93.     Failure to pay said wages to Plaintiff and those similarly situated results in mandatory penalty wages and attorneys' fees pursuant to La. R.S. 23:632 *et seq*.

**COUNT 4**
**VIOLATIONS OF THE LWPA – UNLAWFUL DEDUCTIONS, FINES AND PENALTIES**
**LA. R.S. §§ 23:634 AND 635**

94.     Plaintiff incorporates by reference and re-allege each and every allegation contained above as though fully set forth therein.

95.     La. R.S. 23:634 provides that no employer "shall require any of his employees to sign contracts by which the employees shall forfeit their wages if . . . the employees resign their employment before the contract is completed; but in all such cases the employees shall be entitled to the wages actually earned up to the time of their discharge or resignation." La. R.S. § 23:634(A).

96.     La. R.S. 23:635 further prohibits employers from "assess[ing] any fines against his employees or deduct[ing] any sum as fines from their wages." For the purposes of Section 635, a "fine" means "a pecuniary penalty imposed for the violation of some law, rule, or regulation," including workplace rules and policies. *Stoll v. Goodnight Corp.*, 469 So.2d 1072, 1076 (La. App. 2 Cir. 1985); *Samson v. Apollo Res., Inc.*, 242 F.3d 629, 638 (5th Cir. 2001).

97.     As a condition of employment, Defendants unlawfully required Plaintiffs to sign an Employment Agreement requiring them to forfeit wages that she was entitled to receive under Federal and Louisiana state law.

98.     Further, Defendants violated La. R.S. 23:635 by imposing unlawful "fines" and withholding deductions from the wages owed to Plaintiffs after receiving her notice of resignation as alleged herein.

99.    As a result, Plaintiff, and those similarly situated, are entitled to the wages earned upon her termination on December 1, 2020, plus ninety days wages at her daily rate of pay and attorneys' fees, in accordance with La. R.S. 23:632, for Defendants' refusal to comply with the provisions of La. R.S. 23:634 and 635.

## COUNT 5
### VIOLATION OF LOUISIANA UNFAIR TRADE PRACTICES ACT
### LA. R.S. 51:1401, ET SEQ.

100.    Plaintiff incorporates by reference and re-allege each and every allegation contained above as though fully set forth therein.

101.    The Louisiana Unfair Trade Practices Act (LUTPA) prohibits "unfair and deceptive acts or practices in the conduct of any trade or commerce." La. R.S. 51:1405(A).

102.    Defendants have unilaterally withheld Plaintiff's earned wages and bonuses, or otherwise created schemes whereby these owed wages would be converted from Plaintiff to Defendants by way of fines and penalties.

103.    Defendants' violations of reducing wages and/or fining employees, so that earned wages would not be paid to Plaintiff, represents a practice of knowing and willful behavior.

104.    Defendants brazenly threatened and retaliated against Plaintiff for complaining of wage violations, including by threatening and imposing fines against her, unlawfully withholding her earned wages, demanding that she continue to work without pay, threatening to collect newly levied fines through administrative and/or court action, threatening to report her to her professional licensing board, and threatening to bring malpractice actions against her. These egregious actions of fraud, misrepresentation, and deception, and/or other unethical conduct was all in Defendants' effort to intimidate Plaintiff in furtherance of its illegal pay schemes

## COUNT 6
### CONVERSION AND MISAPPROPRIATION

105.    Plaintiff incorporates by reference and re-allege each and every allegation contained above as though fully set forth herein.

106.    Defendants intentionally interfered with and exercised dominion and control over wages and compensation that Plaintiffs had the legal right to possess as herein alleged.

107.    As a result of Defendants' violations of La. Civ. Code Art. 2315, Plaintiff is entitled to recover the wages unlawfully withheld by Defendants, costs of the action, and pre- and post-judgment interest pursuant to La. Civ. Code Art. 2315.

## COUNT 7
### BREACH OF CONTRACT AND DETRIMENTAL RELIANCE, AND ALTERNATIVE CLAIM OF UNJUST ENRICHMENT

108.    Plaintiff incorporates by reference and re-allege each and every allegation contained above as though fully set forth herein.

109.    Defendants breached its contractual obligations to Plaintiff and those similarly situated under La. Civ. Code Art. 1994 by failing to pay agreed upon, and properly calculated, wages under the FLSA.

110.    Plaintiff, and those similarly situated, detrimentally relied on Defendants' promise to timely pay properly calculated wages and benefits, as well as their agreed upon stipends and non-discretionary bonuses. La. Civ. Code 1967.

111.    Alternatively, where Defendants' unlawful actions did not concern those breaches of contractual obligations, as a direct and proximate result of the acts alleged herein, Defendants wrongfully deprived Plaintiff and those similarly situated of substantial wages and assets and were unjustly enriched by their direct receipt and retention of monies earned by the employees, and which were intended to be paid towards their hourly wage. *See* La. Civ. Code Art. 2298.

112.    Defendants enriched themselves without cause as a result of refusing to pay Plaintiffs all wages to which they are entitled.

## COUNT 8
### QUANTUM MERUIT

113.    Defendants holds money that in equity and good conscience belongs to the members of the class because Defendants was paid money by Medicare and Medicaid and long-term care facilities for the labor performed by the Plaintiff and class members, while Defendants paid said class members for less than all of their time worked on behalf of Defendants without Defendants paying the class members for such work.

## VI.    COLLECTIVE ACTION ALLEGATIONS - 29 U.S.C. § 216(B)

114.    Plaintiff incorporates by reference and re-allege each and every allegation contained above as though fully set forth herein.

115.    A large but unknown number of Nurse Practitioners employed by Defendants have been damaged by patterns, practices and/or policies which constituted a willful violation of the FLSA in 11 different states across the southern United States.

116.    Named Plaintiff has been paid in the same or similar manner as the Putative Class members and were not properly compensated as required by the FLSA. Neither Plaintiff nor Putative Class Members were paid on an exempt salary basis by Defendants, they were at all times covered by the FLSA, and they were all improperly paid by Defendants.

117.    Pursuant to 29 U.S.C. § 216(b), Plaintiff seeks to prosecute her FLSA claims as a collective action on behalf of the members of the putative class which includes all Nurse Practitioners employed by Defendants at any time from three years prior to the filing of this action through entry of judgment in this matter who worked overtime hours for which they were not fully compensated as a result of Defendants' policy not paying overtime or tracking hours worked for Nurse Practitioner job duties.

118.    The affected employees falling within the class include all of Defendants' Nurse Practitioner employees for the indicated period, because all such employees were subject to Defendants' uniform refusal to pay overtime.

119.    Plaintiffs seek 216(b) certification of Defendants' Nurse Practitioner employees who worked overtime for Defendants at any point from three years prior to the filing of suit through entry of judgment.

120.    Defendants' failure to pay properly calculated wages, as required by the FLSA, results from a generally applicable systematic policy and/or practice which is not dependent on the personal circumstances of the Putative Class Members. Thus, Plaintiff's experiences are typical of the experiences of the Putative Class Members.

121.    This action is properly maintained as a FLSA collective action because Plaintiff is similarly situated to the Putative Class Members with respect to Defendants' timekeeping, payroll and operational plans, policies, and practices. Plaintiffs and the Putative Class Members were subjected to Defendants' aforementioned centralized and uniform plans, policies, and practices of improperly calculating and paying overtime.

122.    The FLSA class is so numerous that joinder of all members is impracticable. Although the data required to calculate the precise size of the class is within the sole control of Defendants, Plaintiffs believe the putative class consists of at least 40 current and former employees of Defendants.

123.    Plaintiff will fairly and adequately protect the interests of the Putative Class Members, and have retained counsel experienced and competent in the field of wage and hour law and collective action litigation. Plaintiff has no interest that is contrary to or in conflict with the interests of any of the Putative Class Members.

124.   The collective action mechanism is superior to other available methods for a fair and efficient adjudication of the FLSA claims. Defendants have acted or refused to act on grounds generally applicable to FLSA Putative Class Members. The prosecution of separate actions could create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendants, place a substantial and unnecessary burden on the courts and/or substantially impair the ability of FLSA Putative Class Members to protect their interests.

125.   Plaintiffs know of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a collective action.

126.   The FLSA 216(b) collective action class may be defined as: "All current and former Nurse Practitioners employed by Defendants' at any time within three years prior to the commencement of this lawsuit, through entry of judgment."

127.   Based on nature of Defendants' violations, and the facts and circumstances surrounding their communications to employees, Putative Class Members should be notified of this action, given the chance to join pursuant to 29 U.S.C. § 216(b), and be allowed to equitably toll the limitations period.

## VII.   RULE 23 CLASS ACTION ALLEGATIONS

128.   Plaintiff incorporates by reference and re-allege each and every allegation contained above as though fully set forth herein

129.   Pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and pursuant to 28 U.S.C. § 1367, Plaintiffs seek to prosecute Louisiana state law claims for Defendants' violations of the LWPA; conversion and misappropriation; breach of contract and detrimental reliance or, in the alternative, unjust enrichment; and quantum meruit, as class actions against Defendants.

130.    Plaintiff seeks Rule 23 certification of a class of the Defendants' Nurse Practitioner employees who worked for said Defendants at any point from three (3) years prior to the filing of suit through entry of judgment (hereinafter "the Class").

131.    Plaintiff brings this action on her own behalf, individually, and pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following sub-classes of individuals:

> All current and former Nurses and/or Nurse Practitioners of Defendants, who have been employed at any time within three (3) years of the filing of this Complaint through the present, and have either:
>
> > (1) Not been paid all earned wages by Defendants since termination of employment,
> >
> > (2) are still employed and have not been timely paid all earned wages by Defendants,
> >
> > (3) Had earned wages reduced for any reason, including for "orienting, training, credentialing, licensing, insuring and onboarding" with Defendants, $150.00 per day fine assessments related to termination of employment, and/or Defendants' deduction of all earned wages during an employee's final weeks of employment, or
> >
> > (4) Were fined by Defendants for previously reimbursed expenses such as malpractice coverage and licensing or other contractually promised reimbursements.

132.    Plaintiff is a member of each Class she seeks to represent in this action under Rule 23 of the Federal Rules of Civil Procedure.

133.    The Class, including sub-classes, are sufficiently numerous that joinder of all members is impractical, thereby satisfying Federal Rule of Civil Procedure 23(a)(1). There are dozens of class members during the applicable time period of these claims.

134.    All members of the classes share the same pivotal questions of law and fact, thereby satisfying Federal Rule of Civil Procedure 23(a)(2). That is, all Putative Class Members share the questions of whether Defendants' actions to, contractually or otherwise, impute fines, penalties,

wage reductions, arbitrary "training" expenses, refuse to pay all wages upon termination, or refuse to tender contractually owed reimbursements, are contrary to law

### A.    Causes of Action for Rule 23 Class Members

#### 1.    Violations of the LWPA

135.    Through the various schemes outlined herein, Defendants employed policies, plans, and/or practices resulting in Defendants' failure and/or refusal to tender earned wages to Plaintiff, and those similarly situated, at the rate and frequency agreed upon, and as required by law.

136.    Defendants' actions, contractually or otherwise, to impute fines, penalties, reductions, arbitrary "training" expenses, or any other scheme to convert employees' earned wages to Defendants is an inexcusable attempt to justify wage theft and constitute violations of the LWPA.

#### 2.    Conversion and Misappropriation

137.    Plaintiff, and those similarly situated, incorporate by reference and re-alleges each and every allegation contained above as though fully set forth herein.

138.    Plaintiff and the Putative Class Members had/have all legal rights to the possession of all their earned wages, Defendants' retention and use of the employees' wages is inconsistent with the employees' right of ownership, and Defendants' use of the employees' earned wages constitutes a wrongful taking.

#### 3.    Breach of Contract/Detrimental Reliance and, Alternatively, Unjust Enrichment

139.    Defendants' failure to abide by employment contracts with Putative Class Members is also breach of its obligations under La. Civ. Code Art. 1994. The reasonable value of the breach of contract with respect to the Rule 23 class is the difference between the amount class members were owed from the Monthly Rate and True Up process, and the amount they were actually paid

26

140.    Plaintiff, and those similarly situated, detrimentally relied on Defendants' promise to timely pay properly calculated wages and benefits, as well as their agreed upon stipends and non-discretionary bonuses. La. Civ. Code 1967

### 4. Quantum Meruit

141.    Plaintiff asserts a quantum meruit claim that she and each member of the proposed Rule 23 class provided valuable services to Defendants, that Defendants accepted those services, and that Defendants had reasonable notice that class members expected to be compensated for their services furnished to Defendants. The reasonable value of the services provided, and not paid for by Defendants with respect to the Rule 23 class, is the difference between the amount class members were owed per the work performed, and the number of deductions and/or fines Defendants imputed onto the earned wages of these employees. This includes all hours for which Defendants deducted earned wages from its employees upon termination, and the value of said wages that should have been used to enrich the lives of the Putative Class Members, but was instead used to enrich Defendants

### B.    Requirements for Rule 23 Class Action are Satisfied

#### 1. Numerosity of the Class

142.    The Class, including its sub-classes, are sufficiently numerous that joinder of all members is impractical, thereby satisfying Federal Rule of Civil Procedure 23(a)(1). There are dozens of class members during the applicable time period of these claims.

143.    Although the data required to calculate the precise size of the proposed Rule 23 classes is within the sole control of Defendants, Plaintiff believes that Defendants currently employ more than 40 individuals performing the duties of Nurses and/or Nurse Practitioners. Most of these individuals would not be likely to file individual suits because they lack adequate financial resources, access to attorneys, requisite legal knowledge of their claims, or fear retaliation

## 2. *Questions of Law or Fact Common to the Class*

144.     All members of the classes share the same pivotal questions of law and fact, thereby satisfying Federal Rule of Civil Procedure 23(a)(2). That is, all Putative Class Members share the questions of whether Defendants' actions to, contractually or otherwise, impute fines, penalties, wage reductions, arbitrary "training" expenses, refuse to pay all wages upon termination, or refuse to tender contractually owed reimbursements, are contrary to law.

145.     Through the various schemes outlined herein, Defendants employed policies, plans, and/or practices resulting in Defendants' failure and/or refusal to tender earned wages to Plaintiff, and those similarly situated, at the rate and frequency agreed upon, and as required by law.

146.     Defendants' actions, contractually or otherwise, to impute fines, penalties, reductions, arbitrary "training" expenses, or any other scheme to convert employees' earned wages to Defendants is an inexcusable attempt to justify wage theft and is contrary to law and public policy.

147.     Questions of law and fact common to the proposed Rule 23 classes predominate over questions that may affect only individuals because Defendants has acted on grounds generally applicable to all class members. Among the common questions of law and fact common to Plaintiffs and other members of the Rule 23 Classes are:

        a.   whether Defendants, contractually or otherwise, imputed fines, penalties, reductions, arbitrary "training" expenses, or any other scheme to convert earned wages of class members;

        b.   whether Defendants refused to pay all wages upon termination to class members;

        c.   whether Defendants received and accepted valuable services from the class members while knowing that the class members expected to be compensated for said services at the rate and frequency agreed upon;

        d.   whether Defendants was unjustly enriched by holding money which in equity and good conscience belonged to the class members;

e.  whether Defendants is liable for the damages claimed hereunder, including but not limited to class members' actual damages, attorney's fees, and costs.

148.   Further, by constantly and continuously failing to pay its former employees all of their wages in accordance with LA. R.S. 23:621, *et seq*., Defendants created a scenario where questions of law and fact common to Louisiana putative class members predominate over any questions affecting individual members.

### 3.  *Plaintiff's Claims are Typical of the Claims of the Class*

149.   Defendants' penalty and fine schemes, the refusals/failures to pay final earned wages, and the refusals/failures to tender legally and contractually owed monies, was not the result of any Plaintiff-specific circumstances. Instead, Defendants' actions, contractually or otherwise, to impute fines, penalties, reductions, arbitrary "training" expenses, or any other scheme to convert earned wages, refusing to pay all wages upon termination, and refusing to tender contractually owed reimbursements, arose from its common compensation and payroll policies and practices, which it applied to Plaintiff and Putative Class Members at its facilities in the State of Louisiana and during the class period

150.   Again, a class action is superior to individual adjudication of the claims at issue in this controversy, since the claims are substantially similar and since joinder of all members is impracticable.

151.   Inasmuch as the damages suffered by individual members of the proposed Rule 23 classes may be relatively small, the expense and burden of individual litigation make it virtually impossible for the members of the class to individually seek redress for the wrongs done to them. Thus, a class action is superior to other available methods for fair and efficient adjudication of this matter. Consequently, Plaintiffs are entitled to pursue their Louisiana state law claims as class

actions, pursuant to Federal Rule of Civil Procedure 23(b)(3). Furthermore, management of this suit as a class action will serve judicial economy.

### 4. *Fair and Adequate Protection of Class Interests*

152.   Plaintiff will fairly and adequately represent and protect the interests of the Class. Further, they have retained competent legal counsel experienced in representing classes of employees against their employers related to their claims of unpaid wages under the law, thereby satisfying Federal Rule of Civil Procedure 23(a)(4).

153.   Plaintiff knows of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

154.   The Rule 23 Class can be defined as:

All current and former Nurses and/or Nurse Practitioners of Defendants, who have been employed at any time within three (3) years of the filing of this Complaint through the present, and have:

> (1) not been timely paid all earned wages by Defendants,

> (2) had earned wages reduced for any reason, including for "orienting, training, credentialing, licensing, insuring and onboarding" with Defendants, $150.00 per day fine assessments related to termination of employment, and/or Defendants' deduction of all earned wages during an employee's final weeks of employment, or

> (3) have had earned wages reduced for reimbursement for expenses such as malpractice coverage, licensing or other contractually promised reimbursements.

## VIII.   DAMAGES SOUGHT

### A.   Plaintiff's Individual Damages

155.   Plaintiff is entitled to recover their unpaid hours falling below the minimum wage required by the FLSA. The proposed Putative Class are also entitled to an amount equal to one and one-half times the rate of pay for all overtime worked all of their unpaid overtime and minimum wage compensation as liquidated damages plus liquidated damages, attorney's fees, and costs.

156.    Plaintiff is also entitled to recover liquidated damages under the FLSA for Defendants' retaliatory conduct in response to her protected conduct. 29 U.S.C. §215(a)(3); 29 U.S.C. §216(b).

157.    Under state law, Ms. Spillers is entitled to recover emotional damages, unpaid wages, lost future wages, compensation for fines, and deductions, 90 days of penalty wages, treble damages, costs, attorney fees, and prejudgment and post-judgment interest.

**B.    FLSA Collective Action Damages**

158.    The Putative Class are entitled to recover their unpaid hours falling below the minimum wage required by the FLSA. The proposed Putative Class are also entitled to an amount equal to one and one-half times the rate of pay for all overtime worked all of their unpaid overtime and minimum wage compensation as liquidated damages plus liquidated damages, attorney's fees, costs, and prejudgment and post-judgment interest.

**C.    Rule 23 Class Action Damages.**

159.    Plaintiffs and the proposed Rule 23 class members are entitled to recover all actual damages incurred by them under the alternative theories of unjust enrichment, detrimental reliance, quantum meruit, money had and received, and for failure to pay wages under LA. R.S. 23:621, *et seq*., as well as emotional damages, unpaid wages, lost future wages, compensation for fines, and deductions, 90 days of penalty wages, treble damages, costs, and attorney fees, pursuant to La. R.S. 23:632. The proposed Rule 23 class members are also entitled to prejudgment and post-judgment interest.

**IX.    RELIEF SOUGHT**

160.    WHEREFORE, Plaintiff, and those similarly situated, pray for a judgment against Defendants as follows:

a.    Damages, costs, fees and interest as described above;

b. For certification of and notice to the FLSA Collective Action Classes and Rule 23 Classes, as further defined and determined by motions practice and to properly inform them of their rights;

c. For an Order tolling the statute of limitations on Plaintiffs' FLSA claims (and those who have joined in the suit) to the date of filing of this Suit; and

d. For an Order granting such other and further relief as may be necessary and appropriate.

## X.    DEMAND FOR TRIAL BY JURY

161.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all questions of fact raised by this Complaint.

Respectfully submitted,

/s/ Casey Rose Denson
**Casey Rose Denson (La. Bar #33363)**
**Justine G. Daniel (La. Bar #36856)**
**CASEY DENSON LAW, LLC**
4601 Dryades Street
New Orleans, LA 70115
Phone: (504) 224-0110
Fax: (504) 534-3380
cdenson@caseydensonlaw.com
jdaniel@caseydensonlaw.com

/s/ Kenneth C. Bordes
**Kenneth C. Bordes (Bar #35668)**
**Kenneth C. Bordes,**
**Attorney at Law, LLC**
2725 Lapeyrouse St.
New Orleans, LA 70119
P: 504-588-2700
F: 504-708-1717
E: kcb@kennethbordes.com

***Attorneys for Plaintiff Nickie Spillers***