# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

| | |
|---|---|
| **NICKIE SPILLERS** | **CIV. ACTION NO. 3:21-00762** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **LOUISIANA PHS, L.L.C., ET AL.** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion for collective action certification [doc. # 31] filed by Plaintiff Nickie Spillers.   For reasons detailed below, it is recommended that the motion be DENIED.

### Background

On March 22, 2021, Nickie Spillers, a nurse practitioner, filed the instant complaint against her former employers, Louisiana PHS, L.L.C. ("LA-PHS") and Provider Health Services, L.L.C. ("PHS") as a result of their failure to pay Spillers any wages for her last six weeks of work, which they used to offset fines and penalties they had assessed against her.   *See* Compl., ¶ 1.   Spillers further asserts that she is a non-exempt employee and that LA-PHS and PHS implemented policies and practices that caused her and others like her to work far more than 40 hours per workweek, without payment of overtime compensation.   *Id.*, ¶ 2.   As a result of these policies and practices, Spillers invokes the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, and seeks to certify a collective action on behalf of herself and other similarly situated current and former nurse practitioners who have worked as employees at LA-PHS and PHS's long-term care facilities in order to recover their lost wages, liquidated damages, attorney's fees, and costs.   *Id.*, ¶¶ 3, 84.

Spillers further alleges that LA-PHS and PHS's conduct transgressed various Louisiana state law provisions, including the Louisiana Wage Payment Act, La. R.S. §§ 23:621, *et seq.* (hereinafter "LWPA"); the Louisiana Unfair Trade Practices Act, La. R.S. §§ 51:1401, *et seq.* (hereinafter

"LUTPA"); Louisiana Civil Code Article 2315 for conversion and misappropriation; Louisiana Civil Code Articles 1994, 1967, and 2298 for breach of contract, detrimental reliance, and unjust enrichment; plus quantum meruit.   (Compl.).   For her state law claims, Spillers seeks to recover emotional distress damages, unpaid wages, lost future wages, compensation for fines and deductions, 90 days of penalty wages, treble damages, costs, attorney fees, and pre and post-judgment interest. *Id.*, ¶ 157.   Spillers also seeks to certify a class action for her state law claims under Rule 23. (Compl., ¶¶ 128, *et seq.*).

LA-PHS and PHS filed their Answer on May 19, 2021.   [doc. # 5].

On July 14, 2021, the court held a scheduling conference and directed the parties to submit a proposed discovery schedule for the collective action determination consistent with *Swales v. KLLM Transport Services, L.L.C.*, 985 F.3d 430 (5th Cir. 2021).   On July 15, 2021, the court adopted the parties' proposed order, as modified, and authorized preliminary discovery on the collective action issue limited to the following topics:   job duties, employee classifications, facilities, pay structure, work schedules, work policies and procedures, management structure, hiring structure, work contracts, and ownership and management of entities.   (July 15, 2021, Mem. Order [doc. # 13]).   The court set an August 31, 2021 deadline to complete pre-notice discovery and a September 21, 2021 deadline for Spillers to file her anticipated motion for collective action certification.   *Id.*

Discovery was disputed, and Spillers filed a motion to compel discovery responses on September 14-15, 2021.   [doc. #s 16-18].   As a result of the discovery issues, the court twice extended the deadline for collective action certification, ultimately settling upon an October 19, 2021 date.   *See* doc. #s 14-15, 22-23.

On October 19, 2021, Spillers duly filed the instant motion to certify a collective action comprised of "Defendants' Nurse Practitioner employees who worked overtime for Defendants

at any point from three years prior to the filing of suit through entry of judgment."   [doc. # 31].

Spillers contemporaneously filed a motion for leave to amend her complaint principally to add

two defendants, Central Control, L.L.C. ("Central") and TTS Holdings, L.L.C. ("TTS").   [doc. #

30].

LA-PHS and PHS filed oppositions to the motion for leave to amend and the motion for

collective action certification on November 9 and 10, 2021, respectively.   [doc. #s 37-38].   On

November 16, 2021, the court granted Spillers' motion to compel and ordered LA-PHS and PHS

to supplement their discovery responses within fourteen days from the date of the order.   [doc. #

41].

On November 23 and 24, 2021, Spillers filed reply memoranda in support of her pending

motions.   [doc. #s 23-24].   She later filed a supplemental memorandum in support of collective

certification on December 27, 2021, which sparked a supplemental memorandum by LA-PHS

and PHS on January 5, 2022.   [doc. #s 49-52].

On March 4, 2022, the court granted Spillers' motion for leave to amend complaint to

join additional defendants, Central and TTS.   [doc. # 59].   Because LA-PHS and PHS

expressed concerns that the eleventh-hour joinder of two new defendants could impact the

pending motion to certify a collective action, the court stated that it would defer consideration of

the motion for certification for two more weeks so Central and TTS could waive service,

promptly file an answer, and submit a brief in response to the certification motion.   *Id*.

Central and TTS filed answers on May 9, 2022 [doc. #s 65-66], but otherwise did not

avail themselves of the opportunity to weigh-in on the pending motion.   Accordingly, the matter

is ripe.

## **Law**

Pursuant to the FLSA,

3

> [a]n action to recover the liability prescribed in [this section] may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.   No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b).   The FLSA collective action is fundamentally distinct from Rule 23 class actions because in contrast to the latter procedure, the prospective FLSA claimants must affirmatively opt-in to be bound by the action.   *Roussell v. Brinker Int'l, Inc.*, 441 F. App'x 222, 224-25 (5th Cir. 2011) (citing *Sandoz v. Cingular Wireless LLC,* 553 F.3d 913, 916 (5th Cir. 2008)); *Swales, supra.*

Until last year, the Fifth Circuit had declined to establish a legal standard for collective-action certification.   *Roussell, supra* (citation omitted); *see also Portillo v. Permanent Workers, L.L.C.*, 662 Fed. App'x. 277, 279 (5th Cir. 2016).   In the absence of guidance, the district courts frequently filled the void by employing the "similarly situated" test, which was typified by and named after *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D. N.J. 1987).   *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1216 (5th Cir. 1995), *overruled on other grounds by Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148 (2003).

In *Swales v. KLLM Transport Services, L.L.C.*, however, the Fifth Circuit flatly rejected the *Lusardi* "two-step certification rubric," because its flexibility led to unpredictability and its rigidity distracted courts from the ultimate issues before it.   *Swales*, 985 F.3d at 441.   Instead of adherence to *Lusardi*'s "conditional certification" process, the Fifth Circuit directed district courts to "identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of 'employees' is 'similarly situated.'   And then . . . authorize preliminary discovery accordingly."   *Id.*   Crucially, "[t]he fact that a threshold question is

4

intertwined with a merits question does not itself justify deferring those questions until after notice is sent out." *Id.* In fact, "[w]hen a district court ignores that it can decide merits issues when considering the scope of a collective, it ignores the 'similarly situated' analysis and is likely to send notice to employees who are not potential plaintiffs." *Id.* at 442.

Ultimately, the *Swales* court endorsed two interpretive first principles that bind the district courts:

> (1) the FLSA's text . . . . which declares . . . that only those "similarly situated" may proceed as a collective; and (2) the Supreme Court's admonition that while a district court may "facilitat[e] notice to potential plaintiffs" for case-management purposes, it cannot signal approval of the merits *or otherwise stir up litigation*.

*Id.* at 434 (citing *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169, 110 S.Ct. 482 (1989) (emphasis added); *In re JPMorgan Chase & Co.*, 916 F.3d 494, 500–02 (5th Cir. 2019)).

Plaintiff bears the burden of proving that there are other similarly situated workers suitable for collective action certification. *See Swales*, 985 F.3d at 443 n.65. If plaintiff does not meet her burden, then the district court may decide that the case cannot proceed on a collective basis, that it needs further discovery to make the determination, or that only certain subcategories of employees should receive notice. *Id.* at 443. One aspect of the inquiry remains clear: the district court enjoys "broad, litigation-management discretion." *Id.*

In the wake of *Swales*, district courts still do not have a definition of "similarly situated." Accordingly, district courts frequently revert to consideration of the factors that comprised the second stage of the now-discredited *Lusardi* certification process, *i.e.*: "(1) [the] disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to [the] defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations." *Swales,* 985 F.3d at 437 (citation omitted) (quoting factors); *Powell v. One*

5

*Source EHS, L.L.C.*, Civ. Action No. 20-0161, 2021 WL 4227064, at *2 (M.D. La. Sept. 16, 2021) ("three factors from the second step of the *Lusardi* test were undisturbed by *Swales* and thus are still relevant."); *Hamm v. Acadia Healthcare Co., Inc.*, Civ. Action No. 20-1515, 2021 WL 5749900, at *3 (E.D. La. Oct. 19, 2021) (collecting cases); *Trottier v. FieldCore Servs. Sols., LLC*, Civ. Action No. 20-0186, 2022 WL 658765, at *2 (N.D. Tex. Mar. 4, 2022).

It is self-evident that "similarly situated," does not mean "identically situated." *Trottier, supra* (citation omitted).   However,

> courts have held that putative class members must show they were affected by a common policy, plan, pattern or practice to meet the similarly situated requirement. The key consideration is that to be similarly situated, there must be substantial allegations that potential members were together the victims of a single decision, policy, or plan.   [G]eographic commonality is not necessary to meet the similarly situated requirement for a FLSA collective action; instead the focus is on whether the employees were impacted by a common policy.

*Hamm, supra* (citations and internal quotation marks omitted).

The pertinent inquiry is whether the plaintiffs have demonstrated similarity among the individuals, which may be established by showing "some factual nexus which binds" plaintiffs and the potential opt-in members as alleged victims of a particular policy or practice.   *Segovia v. Fuelco Energy LLC,* Civ. Action No. 17-1246, 2021 WL 2187956, at *8 (W.D. Tex. May 28, 2021) (citations omitted).   Furthermore, "the fact that members of the putative collective class work in different facilities or have different job titles does not preclude a finding that they are similarly situated."   *Hamm, supra* (citation omitted). Therefore, even when potential members' work settings differ, this circumstance will not weigh against a finding of sufficient similarity unless liability *turns on* those differences." *Francis-Luster v. Kelley Law Firm, P.C.*, Civ. Action No. 19-2708, 2022 WL 822468, at

*3 (N.D. Tex. Feb. 10, 2022), *R&R adopted,* 2022 WL 575566 (N.D. Tex. Feb. 25, 2022). Moreover, "[w]hen plaintiffs' claims are based on their employer's allegedly unlawful policy, the differences that are unrelated to the policy will not provide a basis for a court to find that the first factor weighs against a similarly situated finding." *Id.* (citation and internal quotation marks omitted).

## <u>Analysis</u>

Spillers alleges that she "worked an average of 60 hours per week actively working, and was on call 24 hours a day, seven days a week." (1st Amend. Compl., ¶ 33). She further alleges that she was a full-time, non-exempt employee entitled to overtime pay. *Id.,* ¶ 33. Spillers proposes to certify a collective action comprised of "[a]ll current and former Nurse Practitioners employed by Defendants[ ] at any time within three years prior to the commencement of this lawsuit, through entry of judgment." *Id.,* ¶ 133. The putative collective action members seek to recover unpaid hours that fall below the minimum wage required by the FLSA, plus one and one-half times the rate of pay for all overtime worked, plus liquidated damages, attorney's fees, costs, and interest. *Id.,* ¶ 165.[1]

Spillers testified at her deposition that she was advised that other nurse practitioners who were in her position, i.e., who went into skilled nursing homes, were compensated the same way she was. (Spillers, Depo., pgs. 21-24; M/Certification, Exh. 7 [doc. # 31-2]). She also adduced evidence that all PHS entities had a policy of not paying overtime to "exempt employees." (PHS Overtime Policy; M/Certification, Exh. 4 [doc. # 31-2]). PHS's Employee Manual

---

[1] It is manifest that the "FLSA protects employees . . . by establishing a minimum hourly wage, maximum work hours, and overtime compensation for work beyond 40 hours per week." *Swales*, 985 F.3d at 434 (citing 29 U.S.C. §§ 206(a)(1), 207(a)).

explains that

> <u>Exempt employees</u> are those who meet the Federal guidelines and definitions of employees exempt from overtime pay.   These employees meet certain guidelines regarding their salary and skill levels.   These employees will not be paid for work in excess of 40 hours per workweek, nor will their pay be deducted if they work less than 40 hours per week.   This assumes all assigned work is completed and there was no excess sick or vacation time taken . . .

(PHS Employee Manual, pg. 8; M/Certification, Exh. 11 [doc. # 31-2]).   PHS provides the

Employee Manual to all PHS care providers for each of its subsidiaries in every state.

(PHS/Simoneaux Deposition, pgs. 20-21; M/*in Limine*, Exh. 1 [doc. # 34-2]).   The policies

apply to everyone.   *Id.*

On March 13, 2017, PHS issued a revised True-Up Process, which applied to nurse

practitioners employed by PHS.   (PHS Policy Number: 9-05.16; M/Certification, Exh. 8 [doc. #

31-2]).   The purpose of the policy was to outline and define PHS's policies and practices for its

encounter-based compensation plan that was rooted in a monthly reconciliation process, a/k/a

The True-Up Process.   *Id.*   Under the True-Up Process, "[p]ractitioners' productivity based

pay" resulted in fixed compensation paid bi-monthly that was set at roughly 90% of the

practitioner's "projected productivity-based income."   *Id.*   The practitioner subsequently might

receive a third payment on the fifteenth of the month that was called the "true up payment,"

which was calculated by subtracting the practitioner's fixed compensation from the "total

productivity based earnings for the same (previous) month."   *Id.*   If the Total Compensation is

less than the payments received for the previous month, the "Group" has the option to carry the

shortfall over to subsequent months, to adjust the practitioner's estimated payments in

subsequent months, and/or to require the practitioner to pay Group the amount of the shortfall.

*Id.*   The True-Up is a reconciliation of the practitioner's productivity.   (PHS/Simoneaux Depo.,

pg. 81).

Of the approximately 105 nurse practitioners who are affiliated with PHS, around 85 have the True-Up policy included in their employment paperwork.   (PHS/Simoneaux Depo., pgs. 83-86).   The 85 nurse practitioners are located in various states.   *Id*.   Simoneaux characterized the True-Up process as a salary plus a bonus.   *Id*., pgs. 92-94.   For 98 percent of the nurse practitioners, their salary does not change on an annual basis.   *Id*., pg. 95. Furthermore, 99 percent of the time, the True-Up policy results in **more** money to the practitioner.   *Id*., pg. 96.   PHS permits practitioners to go into a negative True-Up, but does not adjust their salary.   *Id*.   At some point, however, PHS has a discussion with the practitioner regarding the negative balance, which may be attributed to the practice size or the practitioner's ability to do the work.   *See* PHS/Simoneaux Depo., pgs. 100-101.   "Very, very few" practitioners had their pay reduced because of a negative True-Up balance.   *Id*.   When practitioners are not productive, PHS lowers their salary, but that, according to the PHS/Simoneaux deposition, "literally" happens "a couple of times a year."   *Id*., pgs. 115-116. In addition to Spillers, there were some practitioners whose contracts included provisions for short notice penalty payments, orientation expense recoupment, and medical malpractice reimbursement.   *Id*., pgs. 136-137.

PHS acknowledges that it owns state level sub-entities identified in discovery:   LA-PHS; MS PHS, L.L.C.; WV PHS, L.L.C.; MA PHS, L.L.C.; GA PHS L.L.C.; TN PHS, L.L.C.; Kentucky PHS, L.L.C; PHS of Arkansas, L.L.C.; Alabama PHS, L.L.C.; SC PHS, L.L.C.; and Texas PHS, L.L.C.   *Id*.   (Defs. 1st Amend. & Suppl. Response to Pl. 1st Set of Interr.; Pl. Suppl. Brief, Exh. A [doc. # 49-1]).   Spillers adduced evidence to show that LA-PHS employed 72

nurse practitioners at various nursing homes, skilled care facilities, and hospitals in Louisiana. The other PHS entities also employed nurse practitioners:   MS PHS, L.L.C. employed 16 nurse practitioners during the relevant period; WV PHS, L.L.C., MA PHS, L.L.C., and GA PHS L.L.C. each had one nurse practitioner; TN PHS, L.L.C. employed twelve nurse practitioners during the relevant period;[2] Kentucky PHS, L.L.C had 13 nurse practitioners; PHS of Arkansas, L.L.C., had 33 nurse practitioners during the relevant period; Alabama PHS, L.L.C. had 40 nurse practitioners; SC PHS, L.L.C. had four nurse practitioners; and Texas PHS, L.L.C. had ten nurse practitioners.   *Id*.   All of the nurse practitioners who were employed by these PHS state-level sub-entities were supervised by regional nurse practitioners who were employed by PHS.   *Id*.

According to Spillers, PHS and LA-PHS produced 131 employment contracts with nurse practitioners from outside of Louisiana.   (Pl. Suppl. Brief, pg. 3 [doc. # 49]).   In support of her motion, Spillers provided examples of contracts from the state-level sub-entities, each of which was signed by Dennis Simoneaux or Nicole Howard, PHS's President/COO and CEO/CFO, respectively.   (Defs. 1st Amend. & Suppl. Response to Pl. 1st Set of Interr.; Pl. Suppl. Brief, Exh. B [doc. # 49-1]).   According to Spillers, all but ten of the full-time nurse practitioner contracts, i.e., 121 employment contracts, included the "True Up Process" policy, which tied the nurse practitioner's "salaries" to their productivity.   (Pl. Suppl. Brief, pg. 3 [doc. # 49]).[3]   Nearly all

---

[2]  (Suppl. Resp. to Interr. No. 5).   In its supplemental response to a separate interrogatory, PHS stated that TN PHS, L.L.C. "paid" only five nurse practitioners.   (Suppl. Resp. to Interr. No. 3).

[3]  Albeit, at least one of the contracts that was signed after this suit was filed included a modification to the True Up policy deleting the option of requiring the practitioners to pay "Group" the amount of the shortfall.   *See, e.g*., Mississippi Employment Agreement [doc. # 49-2, pgs. 81-94].

of the contracts also included the same penalties for early termination that are included in Spillers' contract, i.e., short-notice penalty fees, reimbursement for professional liability insurance, and recoupment of orientation expenses and licensure costs.    *Id.*

In addition, Spillers produced a list of 50 instances from 2018-2021, where nurse practitioners, both within and outside Louisiana, had their pay reduced or even negated because of orientation costs, short resignation notice, previous negative True-Up balances, negative PTO balances, licensure cost, equipment cost, malpractice insurance costs, or various combinations thereof.   (Pl. Suppl Brief, Exh. C [doc. # 49-3]).   PHS and LA-PHS produced a separate list of 13 nurse practitioners (plus Spillers), whom they contend were the only nurse practitioners to ever have their pay reduced because of the policies complained of by Spillers.   *See* Defs. Opp. Brief, Exh. 2 [doc. # 38-2]).   Even if these lists are inconsistent, it is manifest that Spillers' experience was not an isolated case.

PHS and LA-PHS assert various arguments against certification.   First, and foremost, they contend that Spillers and the other nurse practitioners are exempt professional employees who are not subject to the FLSA's minimum wage and overtime provisions.[4]   Specifically, PHS and LA-PHS invoke the learned professional employee exemption which includes any employee:

---

[4] Spillers contends that PHS and LA-PHS's merits-based argument(s) transgresses the scope of permissible issues that courts may consider at the certification stage pursuant to *Swales*.   The court is not persuaded.   In *Swales*, the court relied, in no small part, on *In re JPMorgan Chase & Co.*, whereby the Fifth Circuit made it clear that putative collective members do not have a right to be given notice of a potential FLSA claim where the employer established the existence of a legal impediment (such as a binding arbitration agreement) that prohibited the employee from joining the collective action.   *Swales, supra*; *In re JPMorgan Chase & Co.*, 916 F.3d at 503.   Consequently, in *In re JPMorgan Chase & Co.*, the Fifth Circuit recognized that the employer could adduce evidence at the certification stage to show that a putative collective member's FLSA claim was barred.   *Id.*

> (1) Compensated on a salary or fee basis . . . at a rate of not less than $684 per week . . . exclusive of board, lodging or other facilities; and
>
> (2) Whose primary duty is the performance of work:
>
>> (i)    Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction . . .

*Cataldie v. Seaside Healthcare Sys., LLC*, Civ. Action No. 19-0195, 2020 WL 1433538, at \*9 (M.D. La. Mar. 23, 2020) (quoting 29 C.F.R. § 541.300 (2018)).[5]  By regulation, registered nurses generally meet the duties requirement for the learned professional exemption.  29 C.F.R. § 541.301(e)(2).  *A fortiori*, the profession of nurse practitioner also meets the learned professional exemption because it entails further education and greater responsibility than a registered nurse.  *See Liu v. New York Neuromodulation Med., P.L.L.C.*, Civ. Action No. 20-5000, 2021 WL 3406373, at \*2 (S.D.N.Y. Aug. 4, 2021); *Mayhew v. Gen. Med., PC*, Civ. Action No. 18-2177, 2020 WL 338150, at \*6 (S.D. Ill. Jan. 21, 2020), *reconsideration denied,* 2020 WL 5632753 (S.D. Ill. Sept. 21, 2020).

In addition, the record contains evidence that it was expected that the putative collective action members would earn considerably more than $684 per week, as required for the learned professional exemption.  *See, e.g.*, the Exemplar Practitioner Employment Agreements; Pl. Suppl. Brief, Exh. B [doc. # 49-2].  The problem, however, is that, generally,

---

[5] PHS and LA-PHS assert that Spillers has the burden to prove that she and the putative collective members are non-exempt employees.  Case law, however, rebuts this contention and confirms that whether an employee is exempt from overtime pay is an affirmative defense, for which the employer bears the burden of proof.  *Leal v. Magic Touch Up, Inc.*, 855 Fed. App'x. 924, 927 (5th Cir. 2021); *see also Smith v. Ochsner Health Sys.*, 956 F.3d 681, 683 (5th Cir. 2020) (recognizing that exemption under FLSA is an affirmative defense, and thus, employer must establish beyond doubt all of the essential elements of that defense when raised within the context of a summary judgment motion).

> [a]n employee will be considered to be paid on a "salary basis" within the meaning of this part if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, *which amount is not subject to reduction because of variations in the quality or quantity of the work performed.*

29 C.F.R. § 541.602 (emphasis added).   Furthermore,

> [a]n employer who makes improper deductions from salary shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis.   An actual practice of making improper deductions demonstrates that the employer did not intend to pay employees on a salary basis . . .

29 C.F.R. § 541.603(a).

Here, of course, Spillers has adduced evidence that PHS and LA-PHS imposed a True-Up policy on nurse practitioners, in and out of the state of Louisiana, that required reductions to pay if the practitioner did not meet their set production targets.   While the True-Up policy apparently did not often result in reductions to the nurse practitioners' pay, it sometimes did. Furthermore, courts and the Department of Labor have recognized that any salary basis exemption may be lost if the employer requires deduction from an employee's "salary," for training expenses, equipment losses, and alleged "loans," if the employee leaves her position early.   *See Ketner v. Branch Banking & Tr. Co.*, 143 F.Supp.3d 370, 379 (M.D.N.C. 2015) (discussing DOL opinions); *Baden-Winterwood v. Life Time Fitness*, Civ. Action No. 06-0099, 2007 WL 2029066, at *15–16 (S.D. Ohio July 10, 2007), *aff'd in part, rev'd in part*, 566 F.3d 618 (6th Cir. 2009) (when performance of the individual plaintiffs fell below defendant's expectations, resulting in bonus overpayments, defendant reduced their salaries precisely because of the change in their individual performances).   Besides Spillers, there is evidence that PHS and its state-level sub-entities imposed such practices upon 13 nurse practitioners or in 50 instances.   *See* discussion, *supra*.

13

If PHS and its state-level sub-entities have an actual practice of making improper deductions, then under the applicable regulation

> the exemption is lost during the time period in which the improper deductions were made for employees in the same job classification working for the same managers responsible for the actual improper deductions. Employees in different job classifications or who work for different managers do not lose their status as exempt employees . . .

29 C.F.R. § 541.603(b). Spillers was supervised by regional nurse practitioner, Stacy Durr, who oversaw 25 nurse practitioners in Louisiana and Texas at any given time. (Defs. 1st Amend. & Suppl. Response to Pl. 1st Set of Interr.; Pl. Suppl. Brief, Exh. A [doc. # 49-1, pg. 10]). Thus, potentially, 24 other nurse practitioners in Louisiana and Texas would lose exempt status for the period where Spillers suffered deductions from her pay, even if they did incur deductions themselves. *See Baden-Winterwood, supra*. If, as Spillers likely alleges, the deductions were authorized at the highest management levels of PHS, then it is possible that the exemption could be lost to a greater number of nurse practitioners.

In short, PHS and LA-PHS have not established that the putative collective action members are exempt employees, and the undersigned cannot recommend denial on this sole basis.

PHS and LA-PHS next argue that the salary-basis test will require individualized determinations with respect to the existence of a guarantee, together with a painstaking plaintiff-by-plaintiff and week-by-week analysis. While the undersigned is not moved by such sweeping and conclusory generalizations, for each putative collective member there ultimately must be a finding regarding the number of hours that he or she worked in excess of forty during any period that the exemption was lost. Normally, such determinations do not present insurmountable

14

hurdles to collective action certification.   Here, however, PHS and the state-level sub-entities apparently did not track nurse practitioner hours.   Without these records, it may be necessary to recreate the number of hours worked from patient encounter records and testimony from each nurse practitioner.   *But see T.S. by & through P.O. v. Burke Found.*, 521 F.Supp.3d 691, 697 (W.D. Tex. 2021) (questions regarding the number of hours worked "are questions of damages that do not negate the class members' sufficient similarity").   Certainly, PHS's lack of record keeping is not held against Spillers, but additional fact-finding is required.

Further, PHS and LA-PHS relatedly argue that Spillers has not shown that she was similarly situated to other nurse practitioners in terms of the job duties that they performed, whether they worked at a hospital, a nursing home, or via telehealth, the scope of their agreements with their collaborative physicians, and even whether any other nurse practitioner worked over 40 hours per week.   Importantly, some of the nurse practitioners had medical assistants who apparently helped the nurse practitioners with chart preparation.   *See* Spillers, Depo., pgs. 14-15; Defs. Opp. Brief, Exh. 1 [doc. # 38-1]).   This is where Spillers' motion fails. Even if there are or were a significant number of nurse practitioners employed by PHS and/or LA-PHS who were subject to the disputed policies, these different practice settings, differing work conditions, and selective employment of medical assistants potentially affect how many hours per week each of the putative collective members worked.   Given these potentially material differences, Spillers has not demonstrated that all, or even most, of the putative collective members are similarly situated to her and entitled to recover minimum wages or overtime for any period where exempt status was lost because of pay reductions applied to other nurse practitioners.

15

The foregoing omission is further highlighted within the context of PHS and LA-PHS's next argument, which is that Spillers has failed to identify even one other nurse practitioner who is interested in joining this litigation.    One of the three elements that some courts used at the initial notice stage of the now-discredited *Lusardi* analysis, was a requirement that plaintiff show that there are similarly situated, aggrieved individuals who want to opt-in to the lawsuit.    *See Villarreal v. St. Luke's Episcopal Hosp.*, 751 F.Supp.2d 902, 915 (S.D. Tex. 2010).    Quite understandably, some courts characterize this conundrum as a "chicken and egg" problem, or even a "Catch-22," because the FLSA plaintiff is required to identify interested collective members, which is the principal purpose behind conditional certification and notice.    *See Detho v. Bilal*, Civ. Action No. 07-2160, 2008 WL 2962821, at *3 (S.D. Tex. July 29, 2008); *Venable v. Schlumberger Ltd.*, Civ. Action No. 16-0241, 2017 WL 2870400, at *5 (W.D. La. June 5, 2017), *R&R adopted*, 2017 WL 2870063 (W.D. La. July 3, 2017).    As a result, some courts dispensed with this jurisprudentially imposed requirement because it is not supported by statute, no binding higher court has imposed it, and/or to further the liberal construction of the FLSA to uphold its purpose.    *See Contreras v. Land Restoration LLC*, Civ. Action No. 16-0883, 2017 WL 663560, at *6–7 (W.D. Tex. Feb. 17, 2017); *Edwards v. Univar USA, Inc.*, Civ. Action No. 20-0778, 2021 WL 101480, at *2 (N.D. Tex. Jan. 12, 2021).

However, it is clear in the Fifth Circuit that *Swales* and *JPMorgan Chase & Co.* purposefully upset the prior lenient certification of FLSA collective actions.    One of the two unequivocal and binding commands that *Swales* offered the district courts is that while the courts may facilitate notice to potential plaintiffs, they "cannot signal approval of the merits or otherwise stir up litigation."    *Swales, supra*.    Similarly, in *JPMorgan Chase & Co.*, the court

16

flatly stated that the district courts cannot stir up litigation by alerting those who ultimately cannot participate in the collective. *In re JPMorgan Chase & Co.*, 916 F.3d at 502.

Although the case has been pending over one year, Spillers is unable to point to anyone else who is interested in joining this litigation. PHS and LA-PHS affirmatively state in their discovery responses that, apart from Spillers, they have not received complaints from anyone concerning pay compensation, meal break policies, contracts, and/or failure to pay overtime. (Defs. 1st Amend. & Suppl. Response to Pl. 1st Set of Interr.; Pl. Suppl. Brief, Exh. A [doc. # 49-1, pgs. 15-16]). While the court cannot and does not require plaintiff to identify every prospective collective action member prior to notice, *Swales* and *JPMorgan Chase & Co.* strongly suggest that some showing is required. Otherwise, the court simply will be stirring up litigation. After *Swales,* it is not business as usual for the heretofore all-but-automatic conditional certification of FLSA collective actions. Rather, the Fifth Circuit intended to rein in the opportunity for abuse of the procedural device by plaintiffs as a means to exert "formidable settlement pressure" on defendants. *See Swales, supra*. The undersigned does not suggest that Spillers or her counsel is guilty of this practice, but it must be acknowledged that the unequivocal dictates of *Swales* now require more.[6]

---

[6] *See Berridge v. Pediatric Home Healthcare, LLC*, Civ. Action No. 20-1025, 2021 WL 4083407, at *2 (W.D. Tex. Sept. 8, 2021) (even though this case has been pending for a year, plaintiff has yet to identify another potential opt-in who seeks to join this lawsuit); *Carey v. 24 Hour Fitness USA, Inc.*, Civ. Action No. 10-3009, 2012 WL 4857562, at *4 (S.D. Tex. Oct. 11, 2012) (certification denied, in part, where plaintiff failed to present evidence of similarly-situated individuals who were interested in joining the lawsuit); *Dybach v. State of Fla. Dep't of Corr.*, 942 F.2d 1562, 1567 (11th Cir. 1991) (before providing notice to potential opt-in members, the court must satisfy itself that there are other employees who desire to "opt-in"); *Morales v. Thang Hung Corp.*, Civ. Action No. 08-2795, 2009 WL 2524601, at *3 (S.D. Tex. Aug. 14, 2009) (one consent to join a collective action is not enough to establish that the collective action is the most efficient way to proceed with litigation); *Ali v. Sugarland Petroleum*, Civ. Action No. 09-0170,

Finally, although not raised by PHS and LA-PHS, the court notes that Spillers seeks to certify a collective of nurse practitioners employed by Defendants "at any time within three years prior to the commencement of this lawsuit, through entry of judgment."   However, "[u]nder 29 U.S.C. § 256(b) of the FLSA, if a plaintiff is not a specifically named plaintiff but opts-in to a pending collective action, he commences his action 'on the date on which such written consent is filed in the court in which the action is commenced.'"   *Sandoz v. Cingular Wireless, LLC*, Civ. Action No. 07-1308, 2014 WL 3045532, at *5 (W.D. La. July 3, 2014), *aff'd.*, 675 Fed. App'x. 448 (5th Cir. 2017), *opinion amended and superseded on denial of reh'g,* 700 Fed. App'x. 317 (5th Cir. 2017).   The limitations period set out in the FLSA are subject to equitable tolling.   *Id.* (citation omitted).   However, the party who invokes equitable tolling bears the burden of proof to show that he or she diligently pursued their rights, but was unable to discover essential information pertaining to the claims.   *Id.*   (citation omitted).   Of course, this inquiry necessitates an "individualized examination of the claims of each opt in plaintiff," which renders them not similarly-situated for purposes of collective action certification.   *See Sandoz, supra.*   The court also cannot solicit putative members whose claims are facially time-barred.   *See In re JPMorgan Chase & Co.*, *supra.*

In sum, the court is constrained to find that, at least at this stage of the litigation, Spillers has not shown that the members of the putative collective action are similarly situated, or that by providing notice to her proposed collective action members, the court would not be stirring up litigation.[7]   Accordingly,

---

2009 WL 5173508, at *5 (S.D. Tex. Dec. 22, 2009) (plaintiffs must submit more evidence than a single affidavit to demonstrate that other plaintiffs exist and that they wish to join the suit).

[7] In light of the undersigned's recommended grounds for resolving Spillers' motion, the court

IT IS RECOMMENDED that the motion for collective action certification [doc. # 31] filed by Plaintiff Nickie Spillers be DENIED WITHOUT PREJUDICE.[8]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.C.P. Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.   A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.   A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.   Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 10th day of May, 2022.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE

---

need not reach the additional arguments raised by the parties.

8  At this stage, with the evidence that has been adduced, the undersigned is not convinced that Spillers has met her burden under the precedent for collective action certification.   However, given the evidence that Spillers has adduced, it may be possible for her to meet her burden as the case proceeds on her individual claims.